**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA

v.                                    Criminal Action No. 3:20-cr-00110

OCTAVIOUS L. TAYLOR,

     Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT'S MOTION TO SUPPRESS AND INCORPORATED MEMORANDUM OF LAW ("Motion to Suppress") (ECF No. 12). The Court previously issued an ORDER granting the Motion to Suppress (ECF No. 27). The reasons for doing so are set forth below.

**BACKGROUND**

In a one count Indictment, Octavious L. Taylor was charged with possession with intent to distribute fentanyl, heroin, and cocaine base. INDICTMENT, ECF No. 9. Taylor subsequently filed a motion to suppress arguing that the evidence to be used against him was the fruit of an unreasonable seizure. Mot. to Suppress, ECF No. 12. The facts that form the basis for Taylor's motion and its resolution are set forth below.

**A. The Identification of Taylor**

On April 10, 2020, a felony capias warrant was issued for Simeon Pierce on a charge of possessing a controlled substance in

violation of Va. Code Ann. § 18.2-250 (Govt's Ex. 4).  On May 1, 2020, Hopewell Police Detective Grant, who was not on duty at the time, observed Pierce standing in the driveway behind 200 South Mesa Drive in Hopewell, Virginia.  Detective Grant reported Pierce's location to the Hopewell Police telecommunications office, and two patrol officers were dispatched to the Mesa Drive residence to arrest Pierce.  However, Pierce fled, using an SUV (color not in the record).  After a short pursuit, Pierce stopped the SUV, jumped out of it, and fled, successfully eluding the pursuing officers.  The SUV was then seized and impounded.  As of May 5, 2020, Pierce was still at large.

On May 5, 2020, while on routine patrol, Hopewell Police Department Officer Clayton Drahms was traveling south on South Mesa Drive at 35 miles per hour when he looked to his right and saw that, in the driveway behind 200 South Mesa Drive, a black male was standing next to a bright orange SUV.  Having observed the profile of the black male from a distance of about 80 feet for a "few seconds" while traveling at 35 miles per hour, Drahms concluded that the black male was Pierce.[1]

_____

[1] The SUV in which Pierce fled on May 1 was a rental car.  The United States, in its brief and argument, seems to attach some import to the fact that both the SUV in which Pierce fled on May 1 and the SUV next to which the black male (Taylor) was standing on May 5 were rental vehicles.  But, at the time Drahms identified Taylor as Pierce, Drahms only speculated that the orange SUV might be a rental vehicle.  The after-acquired fact that the orange SUV

**B. The Stop of Taylor**

Drahms immediately radioed a notification to that effect; and, because Pierce had fled on May 1, Drahms asked for officers to assist in serving the arrest warrant on Pierce.  At the same time, Drahms sought confirmation that the arrest warrant for Pierce remained outstanding.  Drahms then turned his car around and parked on the side of the road to await the arrival of the backup patrol units.  Meanwhile, the telecommunications office confirmed that the arrest warrant for Pierce was still valid.

While Drahms was waiting, he observed the orange SUV pull out of the driveway at 200 South Mesa Drive; and, as the SUV passed his patrol car, Drahms saw that the driver was the same person he had identified moments before as Simeon Pierce.[2]  Drahms pulled behind the SUV and, within a minute, initiated a stop to arrest Pierce on the outstanding arrest warrant.

The record is not entirely clear how it was that Drahms concluded that the black male standing in the driveway of 200 South Mesa Drive was Simeon Pierce.  However, the record does show that,

was a rental vehicle is of no moment in the analysis of reasonableness.

[2] At the suppression hearing, Drahms specifically testified that, at this point, he was only able to confirm that the driver of the SUV was the same person that Drahms had seen standing by the SUV because the person standing by the orange SUV and the driver were both wearing the same bright patterned shirt.  Therefore, this additional view of the driver did nothing more to confirm or dispel Drahms' suspicion that the driver was Simeon Pierce.

in October 2018, Drahms had a four to five minute, rather memorable, encounter with Pierce when Drahms had chased and apprehended a fleeing Pierce and then subsequently arrested him. Between October 2018 and May 2020, Drahms had no contact with Pierce, but Drahms did receive two internal Hopewell Police Department "top offender sheets" each of which displayed a photograph of Pierce (Govt's Ex. 7). The "top offender sheets" recited that Pierce stood 6'2" and weighed 157 pounds.

Nothing in the record shows that Pierce had a history of violent behavior. But, as of May 5, 2020, Drahms was aware that Pierce had been known to possess firearms. He knew that Pierce was thought to be a member of the OTM (Out the Mud) gang.[3] He knew that "a lot" of OTM members were known to drive rental cars. And, he had heard from other officers that the resident of 200 South Mesa Drive would sometimes work on vehicles[4] for someone associated with the OTM gang.

At the time he initiated the traffic stop, Drahms did not believe that there was any specific public safety concern necessitating Pierce's immediate apprehension. Rather, Drahms was merely acting pursuant to his department's general practice that,

---

[3] Nothing in the record tells of violent conduct by the OTM gang.

[4] The record does not reflect if those cars were rental cars or not.

if an officer knew of an active warrant and saw the subject of the warrant, the officer should take the subject into custody.

At the suppression hearing, Drahms testified that, after he pulled over the orange SUV in the parking lot of a small store, the vehicle twice pulled into, and then exited, parking spots and then continued driving. That conduct caused Drahms to become concerned that the vehicle was stalling for time or about to flee. When the vehicle stopped, Drahms drew his weapon and directed the driver to exit the vehicle and walk backwards towards Drahms. At the suppression hearing, Drahms explained that, because he was executing a felony warrant and because Pierce had a history of fleeing, Drahms was conducting the stop as a "high-risk traffic stop."

## C. The Arrest and Searches of Taylor

Taylor did as the officer requested and walked backwards holding his driver's license in his hand. "Before getting the driver's license of the defendant, and while the defendant was approximately five feet away, Officer Drahms smelled the overpowering odor of marijuana emanating from the defendant."[5] Gov. Resp. at 2, ECF No. 14. When Taylor reached Drahms, Drahms immediately put him in handcuffs. As depicted in the body-worn

---

[5] Curiously, at the suppression hearing, Drahms testified that he smelled "unburnt" marijuana, but the only "unburnt" marijuana found was the marijuana shake (i.e., mere residue) found in Taylor's car, not on his person.

camera video provided in discovery, Drahms almost immediately said, "It's not going to be the guy." Mot. to Suppress at 2, ECF No. 12.

At this point, Drahms asked Taylor why he smelled of marijuana. Taylor responded that he had been somewhere where other people were smoking. Drahms subsequently repeated the question; and, this time, Taylor admitted to having smoked marijuana. Drahms then asked if there was anything else in the vehicle, and Taylor told Drahms that there was a registered firearm in the SUV.

Drahms then approached the vehicle to make sure that there were no other occupants. When he was responding to Drahms' commands to exit the SUV, Taylor had not closed the door. And, when Drahms approached the SUV, he smelled marijuana "emanating from the driver side door." Gov. Resp. at 3, ECF No. 14.

Drahms then returned to Taylor and asked where exactly the firearm was located in the SUV. Taylor responded that the firearm was under the front seat, but Taylor stated that he had a concealed carry permit. "Officer Drahms then entered his patrol car. There, Officer Drahms confirmed that the defendant lied — he did not have a concealed carry permit." Gov. Resp. at 3, ECF No. 14.

"[U]pon talking with a more experienced law enforcement officer, Officer Drahms decided to proceed with searching the SUV pursuant to the odor of marijuana." Gov. Resp. at 3, ECF No. 14. Drahms and other HPD officers searched Taylor's vehicle and found

(1) a firearm with an extended magazine with 15 rounds of ammunition and one round in the chamber; (2) a small plastic baggy of marijuana residue ("shake"); (3) additional unused sandwich bags; and (4) six cell phones.

Taylor was then arrested for possessing a concealed weapon. When Taylor was searched incident to arrest, the officers found $1,422.00 in U.S. currency on his person. Drahms patted Taylor down and, in the process, felt what he thought were plastic baggies inside Taylor's underwear, so Drahms obtained a state search warrant to further search Taylor's person.

During the search of Taylor's person pursuant to that search warrant, officers found what later turned out to be (1) 39 grams of heroin; (2) 35 grams of a mixture of fentanyl, heroin, and cocaine hydrochloride; (3) 21 grams of cocaine base; and (4) 1.5 grams of cocaine hydrochloride. Later, Drahms also received a search warrant for two of the cell phones found in Taylor's car, and a "search of the phones produced evidence of drug trafficking." Aff. ¶ 18, ECF No. 1-1.

Taylor now requests that "any and all evidence obtained from him, his person and his vehicle should be suppressed." Mot. to Suppress at 1, ECF No. 12.

### DISCUSSION

The parties briefed several issues related to the stop, but most of these issues can be disposed of readily and without

7

extensive discussion because they do not affect the analysis of the key events.  First, Taylor argues that by identifying Taylor as Pierce, stopping the SUV to arrest "Pierce," and conducting the stop at gunpoint, Drahms had effectively arrested Taylor.  Mot. to Suppress at 2, ECF No. 12.  The Government maintains that Drahms' actions amounted to nothing more than a Terry stop until Drahms discovered a concealed weapon in Taylor's car at which time Taylor was arrested.  Gov. Resp. at 10-11, ECF No. 14.

On this record, the "arrest/Terry stop" distinction is not dispositive because in either case, the touchstone is whether or not Drahms acted reasonably.  See Heien v. North Carolina, 574 U.S. 54, 60-61 (2014); accord Gov. Resp. at 10, ECF No. 14 ("Although the issue is not determinative in this case given the foregoing facts, the defendant was not under arrest when Officer Drahms placed him into handcuffs in a public place in sight of others."); Def.'s Reply at 2, ECF No. 15 ("Whether the Court determines that this police-citizen interaction was an arrest or an investigative detention, the issue remains the same: whether Officer Drahms' actions were reasonable given the circumstances.").  The briefing seems to have produced the agreement of the parties on that point.  And, they are correct.

Second, both parties appear to agree that Drahms would have had probable cause to initiate the traffic stop to arrest Simeon Pierce.  Mot. To Suppress at 5, ECF No. 12 ("Taylor concedes that

there was a capias outstanding for Pierce."); Gov. Resp. at 4, ECF No. 14 ("As to the initial stop, the defendant concedes, as he must, that the traffic stop to arrest the subject of an arrest warrant is valid.").

Finally, the Government maintains that, once Drahms smelled marijuana on Taylor, Drahms had an independent basis to continue the stop. Gov. Resp. at 8, ECF No. 14. As the Government points out, that is the long-held view of the Fourth Circuit. United States v. Humphries, 372 F.3d 653, 658-59 (4th Cir. 2004).

However, none of these three issues, however decided, resolves the Motion to Suppress. Instead, the dispositive question is whether Drahms acted reasonably when he identified Taylor as Pierce and, on that basis, stopped the SUV being driven by Taylor.

## A.    Reasonableness

The Fourth Amendment protects, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Thus, by its text, the Fourth Amendment only prohibits unreasonable searches and seizures. Heien v. North Carolina, 574 U.S. 54, 57 (2014). A search or seizure that is premised on a reasonable mistake of fact (or law) is not a violation of an individual's Fourth Amendment rights. Id.

Pursuant to that precept, it is settled that, where a police officer has probable cause to arrest one party, but reasonably

mistakes a second party for the first party, the arrest of the second party is, nevertheless, valid. Hill v. California, 401 U.S. 797, 802 (1971); Heien, 574 U.S. at 61. The same principle applies to a reasonable mistaken identification leading to a Terry stop. See id. "The limit is that 'the mistakes must be those of reasonable men.'" Id. (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). "The reasonableness of" an officer's "belief that he was arresting the correct person must be judged by an objective standard in light of the facts that he possessed at the time of the arrest." Brown v. Witta, 7 Fed. Appx. 275, 278 (4th Cir. 2001) (citing Anderson v. Creighton, 457 U.S. 635, 640 (1987)); Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994).

**B.   Parties' Arguments**

Taylor argues that, as shown by the record, "Drahms' belief that Taylor was Pierce amounted to no more than a hunch and was not reasonable."[6] Def.'s Reply at 3, ECF No. 15. In response, the Government states that Drahms' mistake was reasonable because:

> (1) Pierce, on May 1, 2020, was observed at the Mesa Drive residence by another officer; (2) Pierce, on May 1, 2020, left the Mesa Drive residence in an SUV later discovered to be a rental vehicle and fled from law enforcement when they sought to execute the arrest warrant; and (3) Pierce, who officer Drahms had

---

[6] That, says Taylor, is evident because Drahms has never said what he relied on to reach the conclusion that Taylor was Pierce. Mot. To Suppress at 5, ECF No. 12. The Court agrees that the record does not reflect that Drahms himself ever articulated the basis for his belief that Taylor was Pierce. However, that does not resolve the question of the reasonableness of the identification.

arrested in the past, and the individual actually stopped and later arrested – the defendant – are physically similar and arguably resemble each other. Indeed, the criminal history rundown for each defendant lists them at six feet tall and one hundred seventy pounds and Officer Drahms believed them to have the same haircut.

Gov. Resp. at 5, ECF No. 14.

## C.   Analysis

As a threshold matter, the mistaken identification cases decided in this Circuit do not appear to closely track the facts at hand.   The most common scenarios in mistaken identification cases are those where (1) two individuals share some characteristic (e.g., a name, birthday, etc.) and an officer fails to confirm the details of the actual suspect's physical description or personal identifying information (e.g., a social security number), see, e.g., Day v. Milam, 1:11-cv-97, 2011 U.S. Dist. LEXIS 125334, 2011 WL 5190809 (E.D. Va. Oct. 28, 2011), or (2) one sibling engages in criminal activity and uses the other sibling's name or photo, and the innocent sibling is ultimately arrested.   See, e.g., Baker v. McCollam, 443 U.S. 137 (1979).   Those fact patterns are not present in this case.   And, thus, those cases do not significantly aid the analysis of the present motion.

Likely because of the dearth of factually comparable cases, both the Government and Taylor attempt to rely on the decision in United States v. McEachern, 675 F.2d 618 (4th Cir. 1982) to support their positions.   Although the facts of McEachern are too far

11

removed from the facts of this case to make the decision a useful guide to resolve Taylor's motion to suppress, the decision bears discussing because both parties rely on it.

In McEachern, the defendant, Jimmie McEachern, was mistakenly arrested on a warrant originally issued in the name of his brother, Ronnie McEachern (a.k.a. Nurudeen Haseeb), and a search incident to that arrest revealed incriminating evidence against Jimmie McEachern. McEachern, 675 F.2d at 618. As it turned out, officers had incorrectly concluded that Jimmie McEachern, Ronnie McEachern, and Nurudeen Haseeb were the same person (in fact, they were two people — Jimmie and Ronnie/Nurudeen). Id. at 620-21. The Fourth Circuit held that the mistaken identification was reasonable and in good faith because the agents had collected quite a bit of information suggesting that the two men were the same person:

> Nurudeen Haseeb rented a home on 9702 Woodwind Way, the same address found on Jimmie McEachern's Virginia driver's license and on the ATF forms. Jimmie listed the same D.C. address as his home address as the address which Nurudeen had given as an emergency contact on the lease agreement. The physical descriptions the agents had obtained of Ronnie and Jimmie closely matched. Their birthplace was the same. Moreover, after three different agents compared pictures of Ronnie and Jimmie, all of them were of the opinion that the photographs depicted the same person. Finally, McEachern stated to Pedersen that he was "Haseeb," the same Muslim surname under which Ronnie McEachern rented the Woodwind Way home.

McEachern, 675 F.2d at 622. "Given the existence of strong indicia that Ronnie and Jimmie were the same person, the agents' conclusion

to this effect . . . was eminently reasonable, notwithstanding the agents' information that the two had different birthdates and social security numbers." Id. (emphasis added).

The Government relies on McEachern to support its position, but the facts are clearly distinguishable. In McEachern, agents came to the conclusion that the two brothers were the same person through an investigation lasting approximately a month and a half, with the input of multiple people. Id. at 620. Among other things, signed, legal documents indicated that the two men were associated with at least two of the same addresses. Id. at 620-22. And finally, three agents agreed that the pictures of the two men showed the same person. Id. at 622. As the Fourth Circuit held, there were "strong indicia" to support the misidentification. The same cannot be said here. Thus, McEachern does little for the Government's argument.

Taylor argues that McEachern actually shows that a finding of reasonable mistaken identification must be premised on much more information than what Drahms is reported to have relied on in this case. Def.'s Reply at 3, ECF No. 15. The Court agrees.

The closest published decision that the Court has been able to find to the facts at hand is Dean v. Worcester, 924 F.2d 364 (1st Cir. 1991). In Dean, an excessive force case, officers mistakenly arrested an individual who was "of similar physical appearance" to an escaped felon and who was "near the apartment

house at which" the escaped felon "was believed to be staying and where he was later found." Dean, 924 F.2d at 367-68. The First Circuit found that there was no constitutional violation even though the individual who was arrested was clearly taller than the escaped felon. See id. at 368. Notably, the First Circuit tied its reasonableness analysis to "the tension and urgency prevailing at the moment of arrest" since the escaped felon was believed to be armed and dangerous. Id. at 368.

Even assuming, arguendo, that Taylor and Pierce look somewhat alike, the facts the Government proffers to support the "reasonableness" of Drahms' actions are considerably sparser than those in Dean. There is no indication in the record that Pierce was expected to return to 200 South Mesa Drive, and thus, no reasonable basis to conclude that it was Pierce who was standing in the driveway once again on May 5. Indeed, that Pierce had been at 200 South Mesa Drive when he was spotted and thereafter pursued by the police suggests that he likely would not be there a few days later.

Further, unlike in Dean, there is no showing that there was any kind of urgency necessitating a quick judgment as to whether Taylor was Pierce. In fact, Drahms acknowledged that he was acting pursuant to standard policy to arrest a person if there was an outstanding warrant, not because of any safety concern.

Here, the Court trusts that Officer Drahms executed the stop under the good-faith belief that Taylor was Simeon Pierce.  But, on this record, the Court cannot condone that belief as objectively reasonable.

To begin, the narrow question to be decided is whether a reasonable officer in Drahms' position would have believed that Taylor was Pierce based on what Drahms knew at the time of the identification.  The analysis is complicated somewhat because the record does not show that Drahms himself ever specified exactly what facts he knew at the time he made the identification or what facts he relied on to reach the mistaken identification.[7]  Thus, even if the Court were to accept that both Taylor and Pierce looked somewhat similar in that both Taylor and Pierce are 6'2" black men, with somewhat similar black hair, and roughly similar weights,[8] the record does not permit the Court to conclude that, at the time of the identification, Drahms actually knew the extent

_____

[7] The Court is well aware that the reasonableness of an officer's actions should be an objective inquiry (i.e., based on what a reasonable officer would have done) in light of the totality of the circumstances that the officer knew at the time.  The Court does not interpret that principle to mean that an officer need not explain what facts he or she knew and relied on when taking the action(s) in question.

[8] There was some discrepancy in Pierce's reported weight.  The "top offender sheets" showed that Pierce was 157 pounds.  At the suppression hearing, Drahms testified that the DMV records said Pierce was 170 pounds.  Taylor was later reported to also weigh 170 pounds, but that fact was only known after Taylor was arrested.

to which, if at all, Pierce and Taylor were similar in height, weight, hair color, hairstyle, facial hair (or lack thereof), skin tone, or facial shape.

Based on the Government's arguments and the proffered evidence, the Court is left to infer that, on May 5, Drahms was relying on the follow facts: (1) Pierce, a black man, had been at 200 South Mesa Drive four days earlier, (2) the SUV parked at 200 South Mesa Drive had a Pennsylvania license plate and was a newer model, and (3) based on Drahms' brief sideways glance of the individual's profile from a significant distance, while traveling at 35 mph, the black man standing in the driveway of 200 South Mesa Drive looked like Pierce.

The Government draws comfort in its reasonableness assessment from several factors. However, those three factors do not withstand close scrutiny and are certainly not "strong indicia" that Taylor and Pierce were the same person. See McEachern, 675 F.2d at 622.

First, the Government finds support from the fact that, on May 5, there was a black male standing in the same location where Pierce, also a black male, was standing four days earlier. But, the record provides no basis upon which to conclude that it would be reasonable to think that Pierce, who had fled that location on May 1, would be there four days later. Indeed, under the circumstances, it would not be logical to think that Pierce would

return to the location where he was almost arrested four days earlier.[9]

Second, at oral argument, the Government pressed the point that Drahms testified that he had reason to know that an individual (not Pierce or Taylor) "who is associated with the OTM gang" sometimes brought vehicles to 200 South Mesa Drive to be repaired, and Drahms thought that Pierce was a member of the OTM gang. But nothing about those facts leads to, or even hints at, the conclusion that Pierce was the person standing at 200 South Mesa Drive on May 5, 2020.

Third, the Government makes much of the two rental cars involved here. The Government's logic goes like this: (a) on May 1, Pierce was standing in the driveway of 200 South Mesa Drive next to an SUV which he used to flee the police, and later (after Pierce abandoned it), the SUV was determined to be a rental

---

[9] Cf. Dean, 924 F.2d at 367-68 (emphasizing that officers believed that the escaped felon was staying in an apartment house in the area where officers encountered the man they mistook as the escaped felon); United States v. Ferguson, 2019 U.S. Dist. LEXIS 95075, *3-4 (W.D. La. Apr. 26, 2019), aff'd, 2019 U.S. Dist. LEXIS 93892 (W.D. La., June 3, 2019) aff'd, 816 Fed. Appx. 991 (5th Cir. June 30, 2020) (per curiam)(emphasizing the importance of the location where the mistaken individual was spotted because the actual wanted suspect had strong ties to the location, including that (1) a co-arrestee had recently provided that address as a home address, (2) multiple other addresses in a two to three mile radius were linked to the suspect, and (3) the home of the suspect's grandfather, which the suspect was known to frequent, was less than one mile away).

vehicle; and (b) the orange SUV in the driveway of 200 South Mesa Drive next to which Drahms observed a black man standing was also later determined to be a rental vehicle.    Thus, says the Government, it was reasonable for Drahms to think that the man who was standing next to a rental car in the driveway of 200 South Mesa Drive on May 1, 2020 – i.e., Pierce, was likely to be the man standing next to a rental car in the driveway of 200 South Mesa Drive on May 5, 2020.

To make the Government's point, both (a) and (b) are necessary.    But (b) was not known, only suspected, when Drahms identified Taylor as Pierce, so that cannot be an accepted part of the logic chain on which the Government relies to build its reasonableness argument.    Consequentially, the Government's third factor fails as well.

In sum, these three facets of the Government's reasonableness argument amount to no support at all.

When those aspects of the Government's argument are properly contextualized, the reasonableness of Drahms' identification of Taylor as Pierce turns on (a) a profile view; (b) of a man 80 feet away; (c) made on the turn of Drahms' head; (d) while traveling 35 miles per hour; and (e) while passing a stationary subject.[10]   On

---

[10] The additional fleeting view that Drahms got when the orange SUV passed him does help the reasonableness analysis.  Drahms testified that the driver of the orange SUV was the man that he saw in the driveway of 200 South Mesa Drive, but Drahms clearly said it was

this record, the Court must conclude that the basis for Drahms' identification of Taylor as Pierce was, at best, a hunch and, at worst, a hunch based on the race of the identified man.[11]  That is not an objectively reasonable basis for Drahms' identification of Taylor as Pierce.

For the foregoing reasons, the mistaken identification was unreasonable and the Motion to Suppress was well-taken.

**D.   The Exclusionary Rule**

Neither party briefed the issue of the appropriate remedy for a Fourth Amendment violation, but in light of the seriousness of the facts of this case, it is necessary briefly to address it now.

To begin, the Fourth Amendment demands reasonableness, not perfection.  Heien v. North Carolina, 574 U.S. 54, 61 (2014).  The Fourth Amendment, therefore, can tolerate "some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'"  Id. at 60-61 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).  However, where the mistakes are objectively unreasonable, the

---

because of the distinctive, patterned jacket that man was wearing, not because of any physical resemblance between Pierce and Taylor.

[11] That is not to say that it is improper to take race into account in identifying a person to be arrested.  To the contrary, if, for example, the suspect is white, it is appropriate to confine possible identifications to white people.  Likewise, if the suspect is black, it is appropriate to confine possible identifications to black people.  But, race alone cannot suffice.

government's actions cannot be tolerated.   And yet, the Fourth Amendment "is silent about how this right is to be enforced." Davis v. United States, 564 U.S. 229, 231-32 (2011).

To fill that gap, the Supreme Court created the exclusionary rule — i.e., a prudential doctrine allowing for the suppression of evidence obtained in violation of the Fourth Amendment.   United States v. Calandra, 414 U.S. 338, 347-48 (1974).   The sole purpose of the exclusionary role is to deter Fourth Amendment violations by the government.   Davis, 564 U.S. at 236-37.   However, a court must not only consider the deterrent value of exclusion but also the societal costs of doing so.   Id. at 236.   That is necessary because "[e]xclusion exacts a heavy toll on both the judicial system and society at large."   Id.   And, the deterrent benefits of exclusion vary with the egregiousness of the law enforcement conduct at issue.   Id. at 238.   Exclusion is most appropriate when police misconduct was "'deliberate,' 'reckless,' or 'grossly negligent" and least appropriate when (1) police act with a reasonable and good-faith belief that their conduct is lawful, or (2) the police misconduct at issue was isolated and the result of simple negligence.   Id.

In this case, because of Drahms' serious and objectively unreasonable mistake, the Court finds that all of the evidence subsequently uncovered by police must be suppressed.   Quite obviously this decision is not without its costs.   Significant

evidence of significant criminal conduct is to be suppressed.  And, suppressing that evidence unquestionably exacts a toll on our society, which has a compelling interest in stopping criminal activity.  However, society has an equally compelling interest in making sure that law enforcement officers have a reasonable basis for identifying individuals who are to be arrested.  This record discloses no such basis.

<strong>CONCLUSION</strong>

For the foregoing reasons, the DEFENDANT'S MOTION TO SUPPRESS AND INCORPORATED MEMORANDUM OF LAW (ECF No. 12) was granted by ORDER ECF No. 27.

_____ /s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February ___, 2021